1
2
3
4
5
6
7        IN THE UNITED STATES DISTRICT COURT FOR THE
8               EASTERN DISTRICT OF CALIFORNIA
9
10   **AGENCY SOLUTIONS.COM, LLC**     )   **CV F 11-1014 AWI GSA**
     **d.b.a. HEALTHCONNECT SYSTEMS,**  )
11                                     )
             **Plaintiff**,             )   **MEMORANDUM OPINION**
12                                     )   **AND ORDER ON**
        **v.**                         )   **PLAINTIFF'S MOTION FOR**
13                                     )   **PRELIMINARY INJUNCTION**
     **THE TRIZETTO GROUP, INC.,**     )
14                                     )   **Doc. # 5**
             **Defendant.**            )
15   _____  )
16
17        This is an action in diversity by plaintiff Agency Solutions.Com, LLC dba Health
18   Connect Systems ("HCS") against defendant The TriZetto Group, Inc. ("TriZetto") for
19   misappropriation of trade secrets pursuant to California Civil Code § 3426 et seq.  In the instant
20   motion, HCS seeks a preliminary injunction to prevent TriZetto from marketing a computer
21   software product called "Enrollment Manager" on the ground that Enrollment Manager
22   incorporates trade secrets belonging to HCS.  For the reasons that follow, HCS's motion for
23   preliminary injunction will be denied.  The parties do not dispute that diversity jurisdiction exist
24   pursuant to 28 U.S.C. § 1332.  Venue is proper in this court.
25                         **FACTUAL BACKGROUND**
26   **I.  The April 2009 Strategic Alliance Agreement**
27        HCS is a company that makes and markets software for brokers and underwriters of
28   health insurance plans and policies.  In the jargon of the insurance business, HCS's focus is on

computer programs that service the needs of the "front-end" where individuals and businesses seek individual or group insurance policies or plans offered by brokers and underwriters representing one or more insurance companies.  TriZetto is a company that develops and markets software that services the administrative needs of the insurance companies themselves.  Such software is termed "back-end" software.  HCS, prior to any relationship to TriZetto, was the developer and marketer of a program called "Quote," which is used by brokers to input buyer-specific information and retrieve rate quotes from various insurance providers.  Pertinent to this action, TriZetto developed and markets a software programs called Facets®, which is widely used by major health insurance providers such as Blue Cross, etc. for back-end administrative purposes.  TriZetto's development and marketing of the Facets® program preceded any relationship with HCS.

On April 9, 2009, the parties executed the Strategic Alliance Agreement (the "Agreement"), the purpose of which was to develop what is referred to in the Agreement as the "Integrated Solution."  The Integrated Solution was to be marketed to the public under the name "QuoteToCard," sometimes referred in documents as "QTC" or "Q2C."  According to HCS's complaint, the parties issued a joint press release on May 18, 2009, describing Quote2Card as a product that "will integrate [TriZetto's] Facets® and QNXT™ enterprise and administration platforms with HealthConnect's broadly adopted broker portal and sales automation tools to provide payers and brokers a complete end-to-end solution for sales and service processes, including prospecting, rating and quoting, underwriting, enrollment, billing, membership and customer service."  Complaint at ¶ 12.

The Agreement anticipates that the cooperative effort between the parties will produce a number of work products, primarily in the form of computer programs.  The Agreement delineates what work product will belong to which party and what the duties of the parties are in the protection of each other's intellectual property interests.  The Agreement also anticipates the relationship between the parties when the time comes to market and maintain the Integrated

2

Solution to and for potential customers.  A copy of the Agreement is provided at Exhibit A of

Declaration of Peter Everett in Support of Motion for Preliminary Injunction.  Provisions of the

agreement that appear to be significant to the court's consideration of HCS's motion for

injunction are summarized as follows:

### A.  Duration and Termination of the Agreement

The Agreement establishes that the initial term of the Agreement is five years.  Thereafter

the Agreement could be extended by mutual agreement for sequential terms of two years.  The

Agreement provides specific agreed-upon reasons for termination that include (1) termination for

cause (i.e. breach), (2) change in corporate control, (3) insolvency of either party, (4) failure to

meet specified performance targets, and (4) where there is a failure of the parties to reach

agreement on sequential development plans that are due at specified times.

The Agreement provides that upon termination of the Agreement, each party must

immediately cease use of the intellectual property and confidential information of the other and

shall return to the other party, or destroy, existing copies of confidential information or

intellectual property of the other party except as specified.  The Agreement also provides that

upon termination of the Agreement, TriZetto would cease to market or sell the Integrated

Solution as well as any programs belonging to HCS that TriZetto was authorized to market under

the Agreement.  Although there is disagreement as to whether the termination of the Agreement

was for one of the listed permissible reasons, there is no dispute that TriZetto terminated the

Agreement effective May 2, 2011.

### B.  Intellectual Property Rights Granted

Under Section 4 of the Agreement, the Parties granted to each other limited licenses to

the use of each other's *software* for the limited purposes of: (1) development of interfaces and

functionality required for the Integrated Solution; (2) integration of software between systems;

(3) hosting software of the other Party for the purpose of demonstrating the functionality of the

Integrated Solution to potential customers, subject to no-copy and no-backup restrictions; and (4)

for other marketing activities where potential client access is controlled by TriZetto.  With regard

to *source code*, the Agreement provides for limited access by each party to the other party's

software or source code in complementary paragraphs that are worded as follows

> At [one Party's] reasonable request, subject to the terms and conditions of this Agreement, [the other Party] agrees to provide [the requesting Party] limited access to review the discrete components of the [requested Party's] Software Source Code for the sole purpose for the development of each Interface in accordance with the applicable Development Plan, where the [requesting Party] is responsible for the development of such Interface or the [other Party] has requested assistance in the development of such interface and access to the [other Party's] software is necessary for such development.  In addition, at [one Party's] reasonable request, subject to the terms and conditions of this agreement, [the other Party] agrees to provide [the requesting Party] limited access to the use of the configuration resources necessary for, and for the sole purpose of, the development of each Interface in accordance with the applicable Development Plan, where the [requesting Party] is responsible for the development of such Interface or [the other Party] has requested assistance in the development of such Interface and access to the configuration resources is necessary for such development.

Agreement at ¶¶ 4.2, 4.3.  In addition, the Agreement places the following Restrictions under

Section 4:

> Neither party shall (i) copy, (ii) modify, (iii) reverse engineer, decompile, disassemble or re-engineer or otherwise create or attempt to create or assist others to create the Source Code of the software of the other party, or its structural framework; or (iv) use the other party's software in whole or in part for any purpose, except as expressly provided under this Agreement.  In addition to the confidentiality provisions contained herein, neither party shall cause or permit the display, loan, publication, distribution, transfer of possession (whether by sale, exchange, gift, operation of law, or otherwise), sublicensing or other dissemination of the other party's software, in whole or in part, to any third party, including, but not limited to consultants, subcontractors, systems integrators providing services to such party without the other party's prior written consent, except as expressly permitted under this Agreement.

Agreement at ¶ 4.4.

### C. Intellectual Property Rights Reserved

Pursuant to Section 8 of the Agreement, Each party reserved to itself property rights that

were owned by it according to parallel Agreement language that provided:

> All property rights, title and ownership rights, including worldwide ownership of the Intellectual Property Rights in and to the [Party's] Marks, the

4

[Party's] software and HCS Independent Carrier Services[1] including derivative works thereof or materials or technology related thereto, whether developed by [either party] or any third party, and all Confidential information provided by [one Party to another] hereunder shall at all times remain vested in [the originating Party] and its licensors, except as otherwise provided herein.  All proprietary rights, title and ownership rights, including worldwide ownership of the Intellectual Property Rights in and to Interfaces under the Development Plans by [one Party] shall be owned by [that Party].  The Development plan shall specify which interfaces shall be considered to be developed by [the respective Parties]. Except for the right to use the [marks and/or licenses of one Party] pursuant to Section 4, [the other Party] is granted no Intellectual Property Rights under this Agreement.

Agreement, ¶¶8.1, 8.2.  As to jointly developed intellectual property, the Agreement provides:

Notwithstanding Sections 8.1 and 8.2, all proprietary rights, title and ownership rights, including worldwide ownership of the Intellectual Property Rights in and to any jointly developed Interfaces shall be owned jointly by TriZetto and HCS. In addition all proprietary rights, title and ownership rights, including worldwide ownership of the Intellectual Property Rights, in and to any jointly developed software that provides customers with new functionality and which is not deemed to be a Derivative Work of either party, shall be owned jointly by TriZetto and HCS.  The Development Plans shall specify what is to be considered jointly developed by TriZetto and HCS.  With respect to any jointly owned Intellectual Property Rights, each party disclaims any obligation to render an accounting to the other party for any profits earned (other than pursuant to this Agreement).

Agreement ¶ 8.4.

### D.  Exclusivity

Section 6 of the Agreement provides that TriZetto is to be the exclusive marketing agent for the QuoteToCard product.  Subsection 6.3(a) provides:

Neither HCS nor TriZetto will enter into a joint venture, partnership or other business arrangement with any Sales Automation Vendor to develop, sell, or promote any product providing functionality that is competitive with the functionality offered by the Integrated solution.

///

///

///

///

---

[1]   "HCS Independent Carrier Services" refers to existing or prospective stand-alone software or services owned or provided by HCS that may be marketed independent of the Integrated Solution by TriZetto pursuant to and during the term of the Agreement.

**II. Plaintiff's Conceptual Model and Allegations of Misappropriation**

(Note: arrows represent flows of compatible data between program components.)

### A. Plaintiff's Conceptual Model



"Quote" is HCS's system designed for front-end use by brokers and agents to complete the sale and sign-up of buyers for healthcare plans.

"TO" is a collection of interfaces (Plaintiff alleges eight interface subroutines or programs that are at issue in this action). The interfaces transmit inputs or data between the "Quote" side and the "Card Side" "QTC Manager" refers to the eight "TO" interfaces plus a "post-enrollment program" and other unspecified non-interface programs that, together, were collectively referred to as the "Quote-to-Card Manager".

"CARD" represents TriZetto's product, FACETS®, an administrative program used by more than 140 health insurers for administration of their insurance plans. Both "Quote" and "Card" represent software applications that preexisted the Agreement.

The crux of Plaintiff's allegations of misappropriation of trade secrets is that TriZetto coded a substantial portion of the functionality of the QTC Manager using HCS's "trade secrets and know-how." In particular, HCS alleges that all eight of the "TO" programs and the "QTC Manager" program were coded by TriZetto and *embody* HCS's trade secrets. In this model the "QTC Manager" represents the programming efforts of both parties and embodies HCS's "Trade Secrets and Know-How."

6

***B. TriZetto's Conceptual Model***

TriZetto presents a competing conceptual model that emphasizes the sharpness of the boundary between what TriZetto owns and what HCS owns:

**OWNED AND HOSTED BY HCS**                    **OWNED AND HOSTED BY TriZetto**



The essence of TriZetto's argument is that ownership of the intellectual property relating to the Integrated Solution is signified by who wrote the code for the software and whose server hosts that code.  Thus, in the diagram above, what HCS describes as the "TO" function becomes two sets of interfaces; some owned by HCS and hosted on their servers and some owned by TriZetto and hosted on their servers.  For example, TriZetto alleges that "addProtoGroup," one of the eight interface programs, consists of software developed by HCS and hosted on HCS's servers and of software developed and coded by TriZetto and hosted on TriZetto's servers.  Thus, in TriZetto's conceptual approach, all software, and therefore all rights, are owned by one party or the other.  TriZetto claims ownership of its interface software and of that portion (shaded) of the Integrated Solution called the "Q2C Manager" which is later referred to as the proposed product, "Enrollment Solution."

////

7

*C. HCS's Allegations*

As mentioned, HCS's allegations center mainly around the eight "TO" interface programs.  These programs are numbered and named for reference purposes thus:

Interface 1: "addProtoGroup

Interface 2: "updateProtoGroup"

Interface 3: "terminateProtoGroup"

Interface 4: "rateLoad"

Interface 5: "TriggerQTC"

Interface 6: "EnrollQTCFamily"

Interface 7: "EnrollQTCMultiFamily"

Interface 8: "GetQTCFamily"

The generalized allegation leveled at TriZetto by HCS is that:

> In drafting the code for the "To" interfaces and other software components, [TriZetto] relied extensively on HCS's trade secrets and know-how about automated sales programs for individual/family and small business health insurance plans.  In fact, as noted elsewhere, [TriZetto] solicited HCS's trade secrets and other proprietary knowledge regarding several components critical to that portion of the software, including to ensure that the Card platform could exchange data properly with HCS's Quote application.  In particular, [TriZetto] sought and obtained HCS's proprietary information and knowledge about rating, enrollment and underwriting processes, and the workflow necessary to transmit data to and from a sales automation system like HCS's Quote application.

Complaint, ¶ 26.

Most of the "Trade Secrets"[2] that HCS alleges TriZetto misappropriated are set forth in Appendix 1 of HCS's Complaint which is available as "Exhibit "C" to Plaintiff's Request to Seal Documents" (hereinafter, "Exhibit C").  Exhibit C consists of a list of 26 Trade Secrets, each of which is labeled with a general, rather non-descriptive categorical title.  Each labeled Trade Secret is coupled with a narrative that purports to describe what the trade secret is, how it was

---

[2]    In the analysis that follows, "Trade Secrets" refers to one or more of the listed 26 items set forth in Exhibit "C" or one or more of the additional three items listed in the Reply Declaration of Macciopino.  By contrast, "trade secret" refers to a hypothetical actual trade secret .  By this means the court hopes to avoid confusion when referring to "Trade Secrets" or "trade secrets."

communicated to TriZetto, and how it was incorporated or used by TriZetto.  The "Trade Secrets

are grouped under four categories; "Conception and Design," "Workflow Processes and Flows,"

"Rating and Underwriting," and "Miscellaneous."  Rather than summarize each of the 26  Trade

Secrets, the court will quote one "representative Trade Secret" from each of the first three

categories mentioned above in its entirety in order to illustrate the common themes that crop up

in each of the narratives that describe the 26 "Trade Secrets."

The first is Trade Secret numbered "1" and is under the general heading of "Conception

and Design:"

> On or around mid-April 2009, HCS's Daniel Masciopinto and others from HCS
> met with representatives from [TriZetto] at a two day in person meeting at
> TriZetto's offices in Phoenix, AZ to "kick off" the initial development of
> QuoteToCard.  Per the agenda of this meeting, several topics were discussed and
> Mr. Masciopinto co-led several discussions including "Technical design session:
> Review interfaces . . ." and "Technical session . . . enrollment flows and
> interfaces."  During this meeting, HCS attended each of the sessions and orally
> disclosed know-how and proptietary understanding directly related to these topics,
> including process flow issues and a review of the interfaces that would be needed
> and built.  As a result of these disclosures, the parties agreed "on high level flows
> for new group set up and member enrollment" and "identified necessary interfaces
> for Q2C 1.0." and agreed upon a "Definition of list of BRDs needed for QTC
> 1.0."  (BRD's refer to Business Requirement Documents and are used as
> development plan documents utilized by [TriZetto] to build QTC Manager and the
> interfaces and other software components incorporated therein).  Three of the
> "To" interfaces conceived in this meeting were Interface 1 "addProtoGroup",
> Interface 2 "updateProtoGroup," and interface 3 "terminateProtoGroup."  The
> information orally disclosed by HCS at this meeting was also incorporated into
> the "Overview Requirements – End to End Solution" development plan document
> used by the parties in the development plans as evidenced by the Document
> Version History where it notes "Expand content and address from early review at
> Phoenix on-site."

The second example is numbered Trade Secret # 9, "Process Flow Diagram."  It is listed in the

category labeled "Workflow Processes and Flows:"

> On or around November 5, 2009, Gregg Rosenthal of [TriZetto] sent an email to
> Ms. Jones in which she stated: "I'm wondering if you have any HCS Quoting
> and/or Sales flows for the broker's processes to get folks signed."  Ms. Jones
> responded to Mr. Rosenthal's request in an email dated November 6, 2009, to
> which she attached a spreadsheet showing the quoting flow (with and without
> medical underwriting capabilities), as well as the flow for the enrollment process.
> This spreadsheet disclosed HCS's confidential understanding of how the front-end
> process for quoting and enrollment works, particularly from the perspective of the
> agent, and the costs for the carrier and agent for each step of the process.

[TriZetto] used this to understand how to map the back-end workflow to create an end-to-end process and overall logical end user experience for both the broker and carrier. Such understanding of the front-end process, provided by HCS, was necessary for [TriZetto] to accomplish this objective. [TriZetto] also needed to understand the amount of effort (as evidenced by the cost) required by both brokers and carriers for each process in order to understand the importance of automating each function.

The third and final example is labeled Trade Secret # 18 "Rating Rules." This Trade Secret is listed under the general heading "Rating and Underwriting."

On or around July 2, 2009, Ms. Neben of [TriZetto] sent an email to Mr. Everett of HCS and Mr. Grossman of [TriZetto] asking them to "read and comment" on the attached document entitled "Rating Notes." Mr. Everett responded to Ms. Neben on July 6, 2009, in an email in which he explained how best to achieve an optimal integration between a sales automation application and [TriZetto's] Card platform. Mr. Everett's response was based pon trade secrets and know-how of HCS. Eventually [TriZetto] used this information and insight in designing the optimal way for QuoteToCard to "enable someone at the payer to review the information [submitted by the broker via the sales automation application] and 'bless' the group before open enrollment begins."

As the foregoing examples illustrate, each of the narratives describing a Trade Secret begins with a date at which there is a communication by HCS in response to an express need or requirement by TriZetto for some form of information or understanding. The narrative explains in very general terms what the nature of the information needed is and either expressly or impliedly states that the information was a Trade Secret developed by HCS through their effort and experience. The narrative then relates how the information requested by TriZetto is provided by HCS and incorporated by TriZetto into one or more components or sub-systems of the "To" functionality. Each of the narratives, then, begins with HCS's knowledge and ends with the ultimate incorporation of that knowledge into programming that TriZetto completed. While TriZetto implies that some of the interchange of facts and/or ideas between the parties resulted in source code and/or software produced and owned by HCS, HCS does not mention this.

HCS alleges that in "early 2011" TriZetto formed the intent to cease its exclusive relationship with HCS and to independently market a product that is either very similar to or the same as the QTCManager program – in other words the interface programs and functionality – to HCS's competitors. In this regard, HCS alleges that TriZetto has taken (appropriated) the QTC

Manager which allegedly contains HCS's "trade secrets and knowhow" and renamed it "Enrollment Manager" for purposes of marketing.  HCS alleges that TriZetto offered HCS the unpalatable choice of amending the Agreement to remove the exclusivity provisions or TriZetto would take unilateral action to abrogate the exclusivity provisions of the Agreement.  HCS alleges that an agreement is imminent between TriZetto and one of HCS's competitors whereby the Enrollment Manager program, presumably along with the interface capability, will be transferred to the competitor.

Following expedited discovery, HCS determined that TriZetto had produced a 343 -page service manual to support its stated goal of selling and supporting the Enrollment Manager product.  In its Reply Declaration of Daniel Masciopinto in Support of Motion for Preliminary Injunction (hereinafter "Masciopinto Reply Dec."), HCS alleges that the Enrollment Manager Service Manual "document provides an overview of the design in the software in QuoteToCard manager, including the 'To' interfaces and as such reveals HCS's [T]rade [S]ecrets." Macciopinto Reply Dec. at ¶2.  In the same manner as the list of Trade Secrets in Exhibit C, the Macciopinto Reply Dec. sets fourth a list of three additional Trade Secrets that are purportedly derived from the Service Manual.  The first of these alleges that the Table of Contents of the Service Manual constitutes a Trade Secret because it discloses a "[d]escription of conception architecture for creating [the] integrated end-to-end solution."  The second alleged Trade Secret is listed under the heading of "Rating" and alleges that the Service Manual discloses a description of "EnrollQTCFamily interface as including rate information" and include a description of the "rateLoad interface and service" which is allegedly related to the group rateLoad interface.  Finally, HCS alleges the Service Manual discloses a "[d]escription of the TriggerQTCAction interface and services as kicking off the post-enrollment processing rules." Macciopinto Reply Dec. at 1:24-2:16.

All together, HCS alleges a total of 29 Trade Secrets that are "embodied" in various of the interface functions of the "To" portion of the quoteToCard system.  HCS seeks preliminary

1   injunction primarily in order to prevent disclosure of its "Trade Secrets" through TriZetto's

2   threatened marketing of Enrollment Manager, a set of program functions that are essentially the

3   same as QuoteToCard manager.

4       ### D. TriZetto's Allegations

5       TriZetto's opposition to HCS's motion for preliminary injunction rests on three main

6   contentions.  First TriZetto alleges that the information that HCS disclosed to TriZetto was not

7   trade secret information.  TriZetto does not dispute any of HCS's allegations with regard to the

8   Agreement or with the business purposes of the parties in forming the Agreement.  In general,

9   what TriZetto disputes is the characterization that HCS applies to the information that was

10  transmitted by HCS to TriZetto.  TriZetto contends that the information it received from HCS

11  was either (1) publically available general industry knowledge (such as through the internet), or

12  (2) information that was known to TriZetto through TriZetto's own expertise, or (3) "big picture

13  input" or broad conceptualizations that do not qualify as trade secrete information, or (4)

14  information that was transmitted from HCS to TriZetto but never used by TriZetto or

15  incorporated into any software program.  TriZetto alleges that HCS assiduously avoided sharing

16  detailed information of the sort that could legitimately be considered trade secret.

17      Second, while TriZetto agrees that the work product that was the outcome of the

18  collaboration between the parties under the Agreement includes all of the "To" programs and

19  other management programs listed by HCS, TriZetto alleges that documents exchanged between

20  the parties during the planning stages – that is, before the programs were written – indicate

21  which party is to be responsible for the program and which party is to "own" the programming

22  within the meaning of the Agreement.  In this regard, TriZetto characterizes the line that divides

23  what HCS "owns" and what TriZetto "owns" as being very sharply contractually defined.

24  TriZetto admits of no programming that falls into any intermediate category of ownership and

25  contends that any intellectual property "rights" that might exist are defined and allocated

26  according to how the parties agreed to divide the responsibility for, and ownership of, the

27

28                                    12

various interface and management programs.

Finally, TriZetto contends that, even if there was any information that was passed from HCS to TriZetto that could legitimately be considered trade secret, and even if that information was somehow embodied in programming written by TriZetto, and even if TriZetto were to eventually sell such programming to a third party, there would be no misappropriation through impermissible disclosure of trade secrets.  As the court understands TriZetto's argument, trade secret information, to the extent it may have been incorporated into software, is not disclosed by the software's operation.  TriZetto contends that there has never been, nor is there threatened to be, any disclosure of source code to any third party.  TriZetto contends that injunctive relief is not proper in this case even if there were trade secret misappropriation because there is no possibility of disclosure of such trade secrets to third parties.  To the extent there could possibly be misappropriation by TriZetto by *use* of HCS's trade secrets, TriZetto contends such use could be adequately addressed by an award of damages.

TriZetto, like HCS has submitted substantial volumes of documentation to support their relative positions.  The documents will be discussed to the extent they are relevant in conjunction with the analysis that follows.

**LEGAL STANDARD**

"Injunctions in the area of trade secrets are governed by the principles applicable to injunctions in general."  Whyte v. Schlage Lock Co., 101 Cal.App.4th 1443, 1449 (4th Dist. 2002).  The legal principles applicable to a request for preliminary injunctive relief are well established.  To prevail, the moving party must show either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor."  Walczak v. EPL Prolong, Inc., 198 F.3d 725, 731 (9th Cir.1999); Oakland Tribune, Inc. v. Chronicle Publishing Company, Inc., 762 F.2d 1374, 1376 (9th Cir. 1985).  The two formulations represent two points on a sliding scale with the focal point being the degree of irreparable injury shown.  Walczak, 198

F.3d at 731;  Oakland Tribune, 762 F.2d at 1376.  The greater the relative hardship to [a plaintiff], the less probability of success must be shown.  Walczak, 198 F.3d at 731.  "Under either formulation of the test, plaintiff must demonstrate that there exists a significant threat of irreparable injury."  Oakland Tribune, 762 F.2d at 1376.  In the absence of a significant showing of irreparability, the court need not reach the issue of likelihood of success on the merits.  Id.

## ANALYSIS

California's Uniform Trade Secretes Act ("UTSA"), codified at sections 3426 through 3426.11 of the California Civil Code, "authorizes a court to enjoin the actual or threatened misappropriation of trade secrets."  Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc., 160 Cal.App.4th 288, 296 (2nd Dist. 2008) (citing § 3426.2).  To state a prima facie claim for trade secret misappropriation, a plaintiff must demonstrate: "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff."  Id. at 297.

## I. Probability of Success on the Merits

### A. Trade Secrets

> It is crucial to any CUTSA Cause of action – and any defense – that the information claimed to have been misappropriated be clearly identified. Accordingly, a California trade secrets plaintiff must, prior to commencing discovery "identify the trade secret with reasonable particularity."  (Code Civ. Proc., § 2019.210; See M.Lemley, *the Surprising Virtues of Treating Trade Secrets as IP Rights* (2008) 61 Stan.L.Rev. 311, 344 (plaintiff should be required to "clearly define what it claims to own, rather than (as happens all too often in practice) falling back on vague hand waiving").

Silvaco Data Systems v. Intel Corp., 184 Cal.App.4th 210, 221 (6th Dist. 2010).  To avoid the "vague hand waiving" that the court is cautioned against, the plaintiff is burdened to make two showings.  First, the plaintiff must clearly identify what the "thing" is that is alleged to be a trade secret, and second, the plaintiff must be able to clearly articulate why that "thing" belongs in the legal category of trade secret.

### 1. What is and is not a Trade Secret

A plaintiff requesting injunctive relief has the burden to show that the information that

was misappropriated constitutes a trade secret.  <u>Therapeutic Research Faculty v. NBTY, Inc.</u>, 488 F.Supp.2d 991, 999 (E.D. Cal. 2007).“A ‘trade secret’ is defined as ‘information, including a formula, pattern, compilation, program, device, method, technique or process, that: (1) [d]erives independent economic value, actual or potential, from not being known generally to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s subject to efforts that are reasonable under the circumstances to maintain its secrecy.’  Cal. Civ. Code § 3426.1(d).”  <u>Id.</u>

At the outset, the court notes that although the agreement defines “Confidential Information,” it does not do so in a way that enlarges or modifies the definition of Trade Secret or Confidential Information beyond their traditional legal boundaries.  At subsection 1.4 the Agreement provides as follows:

> 1.4   “**Confidential Information**” shall mean any information disclosed, either prior to or after the Effective Date, by a party (the “Discloser”) to the other party (“Recipient”) , either directly or indirectly, in writing, orally, or by inspection of tangible objects, that is confidential or trade secret information of the Discloser that a reasonable person would recognize as confidential, including the terms of this Agreement, except for information that: (a) is independently developed by the Recipient without reliance on the Confidential Information of the Discloser; (b) is or becomes publicly known through no fault of the Recipient; (c) is already known by the Recipient without breach of any confidentiality obligation to the Discloser; or (d) is lawfully received by the Recipient free from any confidentiality obligation from a third party having the right to provide it without such obligations.

Because the Agreement does not enlarge on the definition of trade secret, the court looks to applicable case authority for guidance.  The case authority the court has reviewed appears to use the statutory categories of things that may constitute a trade secret – information, including a formula, pattern, compilation, program, device, method, technique or process – as illustrative rather than restrictive.  It is this court’s observation that the motion before it seeks to stretch the category of what is a trade secret.  Therefore, the more informative approach is to focus on case authority that illustrates what is not a trade secret.

In <u>Silvaco Data Systems v. Inter Corp.</u>, 184 Cal.App.4th 210 (6th Dist. 2010), *disapproved on other grounds in* <u>Kwikset v. Superior Court</u>, 51 Cal.4th 310, 337 (2011), the

appellate court devotes considerable attention to the issue of what a trade secret is and is not. The Silvaco court noted "[a] patent protects an *idea*, i.e., an invention, against appropriation from others.  Trade secret law does not protect ideas as such.  Indeed a trade secret may consist of something we would not ordinarily consider an *idea* (a conceptual datum) at all, but more a *fact* (an empirical datum), such as a customer's preferences, or the location of a mineral deposit.  In either case, the trade secret is not the idea itself, but *information* tending to communicate (disclose) the idea or fact to another."  Id. at 220-221 (italics in original).  Thus, the *idea* of a interface between the front and back ends of healthcare insurance programs is not a trade secret.  Neither are conceptual notions that determine how the interface or its related programs will work.  The following extended quote from Silvaco is instructive for purposes of this court's analysis:

> the exhibit [submitted by plaintiff to identify a trade secret] does not designate *information* as such but rather describes various features, functions, and characteristics of the design and operation of [plaintiff's] software products.  Thus the first of the 24 listed sub-categories is a "proprietary *method*" of carrying out a function apparently found in competing programs as well. [. . . .] This asserted secret is also described as "a methodology for" implementing that function, apparently in an unusual way, which "contributes [to] performance and accuracy improvements."  This "trade secret methodology" is "implement[ed]" by two named "modules," also described as "functions," which "represent part" of the critical "algorithm."  Three "unique features" of this method are listed:  The "integration" of two other operations; a "method" of "changing and controlling" a variable, which "affects the performance of the simulation"; and a mode of "implementation" that produces "[e]fficiency."

> [Plaintiff's submitted exhibit] thus appears to attempt to characterize various aspects of the *underlying design* as trade secrets.  This of course contravenes the principles discussed above.  The design may constitute the *basis* for a trade secret, such that *information concerning it* could be actionably misappropriated; but it is the information – not the design itself – that must form the basis for the cause of action.  And while the finished (compiled) product might have distinctive characteristics resulting from that design – such as improved performance – they cannot constitute trade secrets because they are not secret, but are evident to anyone running the finished program.  Indeed, to the extent [enhanced characteristics] tend to disclose the underlying, [the underlying design] ceases to be a protectable secret for that same reason.

Id. at 221-222 (all italics in original).

Based on the foregoing, a list can be constructed that summarizes what is not a trade

secret:

1.     "[G]eneral knowledge in the trade or [. . .] special knowledge of those persons who are skilled in the trade" are not trade secrets.  <u>Diodes, Inc.</u> 260 Cal.App.2d at 253.

2.     Ideas or concepts are not, in and of themselves, trade secrets.  <u>Silvaco</u>, 184 Cal.App.4th at 221-222.

3.     Proprietary ways of doing the same thing that others in the same field do are not trade secrets.  <u>Id.</u>  (Note, however, that while the *way* something is done is not a trade secret, some discrete fact concerning that *way* could conceivably be a trade secret.)

4.     Plans, flows, inputs, outputs, rules of operation, priorities of operation, and the like are not trade secrets to the extent they are manifest in the way a program works.  <u>Id.</u>  In other words, background information comprising, for example, the features and functions, the business requirements and the high level design specifications that are incorporated into software and are evident in the operation of the software are not trade secrets.  While source code is undoubtably a trade secret, the way the source code *works* when compiled and run is not.

### 2.  Duty of Pleading Party to Identify Trade Secret with Particularity

For purposes of preliminary injunction, the party seeking injunctive relief must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies."  <u>Diodes, Inc. v. Franzen</u>, 260 Cal.App.2d 244, 253 (1968).  The obligation to identify alleged trade secrets with specificity serves the needs of the court in addition to the defendant.  In <u>Imax Corp. v. Cinema Technologies, Inc.</u>, 152 F.3d 1161 (9th Cir. 1998) the appellate court held that the district court properly rejected a claim that information was a trade secret where the plaintiff "failed to carry its burden of identifying *for the court*" exactly what information was claimed to be a trade secret.  <u>Id.</u> at 1167-1168 (italics added); <u>see</u> <u>also</u> <u>Universal Analytics, Inc.</u> <u>v. MacNeal-Schwendler Corp.</u>, 707 F.Supp. 1170, 1177 (C.D. Cal. 1989) (plaintiff failed to inform defendant or the court "precisely which trade secret it alleges was misappropriated"), *aff'd,* 914 F.2d 1256 (9 Cir. 1990).  A district court can therefore reject a claim that information is a trade secret *sua sponte* if the information is not identified by the claimant with sufficient particularity to allow the court to determine what the information is.

17

The fact that a particularized description of an alleged trade secret is a duty owed to the court simplifies the determination of what is required to meet that obligation. Case authority pertaining to trade secrets makes it clear that, while courts are expected to make an item-by-item determination of what is and is not a trade secret, alleged trade secrets that are not sufficiently identified to be included within either category cannot be the basis of a claim of misappropriation. See MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 551, 520-522 (9th Cir. 1993) (specific customer database is a trade secret while misappropriation claim based on generalize assertion of trade secrets in diagnostic software and operating systems must fail because the alleged trade secrets are not identified with sufficient specificity). In sum, information that is alleged to be a trade secret[3] falls within one of three categories: (1) information that can definitely be identified as a trade secret, (2) information that can be definitely identified as not a trade secret, and (3) the information is insufficient to permit placing it in either category (1) or (2). A claim for misappropriation can only be based on information in the first category.

### B. Do the Alleged Trade Secrets Qualify as trade secrets?

HCS listed its Trade Secrets in Appendix 1 in four categories. The following discussion analyzes whether any or all of the alleged Trade Secrets within each category are sufficiently described as trade secrets.

---

[3]    The court has noted that HCS's complaint identifies the Trade Secrets identified in Appendix 1 of the complaint as "*examples* of HCS's trade secrets and other proprietary knowledge . . . ." Complaint at ¶ 27 (italics added). In a similar manner, HCS's motion for preliminary injunction references the Declaration of Daniel Masciopinto ("Masciopinto Decl."), which sets forth a list of "Trade Secrets" that generally track those listed in Appendix 1 to the complaint, and introduces the list as being "[e]xamples of such trade secrets and know-how . . . ." Masciopinto Decl at ¶ 17. Clearly, the requirement of specific identification of the trade secret that is alleged to have been misappropriated precludes any attempt by a plaintiff to contend that the complaint alleges by inference the misappropriation of trade secrets other than the ones specifically described in the pleadings. As the court pointed out at oral argument, for the court's purposes in the analysis of the instant motion, HCS's list of 26 items in Exhibit "C" and the additional three items in the Masciopinto Reply Dec. constitute an exhaustive list of all possible Trade Secrets alleged by HCS.

18

### 1. Conception and Design Trade Secrets

The first three of the alleged Trade Secrets are described as the product of face-to-face conversations that occurred at the beginning of the collaboration between HCS and TriZetto. The first of these collaborations occurred in Phoenix and resulted in the production of "high level flows for new group set up and member enrollment" and identified the necessary interfaces." Appx 1 at ¶ 1. The second face-to-face meeting took place in Denver and addressed "Phase 2 needs and functionality and market need." A third meeting occurred in Denver in November 2009 to discuss "the potential functionality and capabilities to be added to QuoteToCard based upon an understanding of the needs of prospective customers." Id. at ¶ 3. In each of these three meetings, HCS alleges its representative(s) provided input, insight, know-how, "proprietary understanding," etc. In each example, HCS alleges there emerged from the process an understanding, usually memorialized in a document or documents, that was/were used to provide high-level guidance for product development. HCS does not allege that in any of the three meetings they provided any discrete item, plan, list, formula, compilation or any other discrete factual datum. In each of the three examples the court is asked to find that the product or documents that emerged as a result of HCS's participation in the meetings constitutes a Trade Secret because it embodies HCS's knowledge, insight or know-how.

HCS's failure to meet its burden to show that the alleged Trade Secrets were, in fact, trade secrets can be expressed in at least two ways. First, the descriptions HCS provides for the first three "Trade Secrets" are far from specific enough to discern the nature of the Trade Secret that was allegedly being disclosed or misappropriated. The first of the three alleges "HCS attended each of the sessions and orally disclosed know-how and proprietary understanding directly related to these topics, including process flows and interfaces that would be needed to be built." Appx. ¶ 1. The second merely states that HCS provided "insights." The third of the alleged Trade Secrets is only slightly more specific in that it alleges that HCS's representatives Everett and Masciopinto "addressed" meeting topics pertaining to market requirements and

"orally disclosed confidential information about these topics."  HCS alleges in concluding the

narrative that "The information Mr. Everett and Mr. Masciopinto discussed was based on trade

secrets and know-how HCS has developed based on our time in the sales automation industry

for health insurance."  Appx. 1 at ¶ 3.  None of these statements or narratives comes close to

providing a basis for understanding the boundaries or nature of the alleged Trade Secret, nor

does it provide any basis for a determination that the alleged secret is not a matter "of general

knowledge in the trade or of special knowledge of those persons who are skilled in the trade."

Second, the first three Trade Secrets are not trade secrets.  To the extent HCS's narrative

is sufficient to describe anything, it describes only that its representatives who were experienced

and skilled in the topics being discussed provided the benefit of their insight and know-how.

There is no discrete "fact" that was provided by HCS.  As noted above, insight, knowledge and

know-how acquired by an insider to a particular trade does not, in and of itself, constitute trade

secrets.  Similarly ideas and broad conceptualizations are not trade secrets.  Finally, pursuant to

the holdings in Silvaco, information that is reflected in the way software functions from the

point of view of the user is not trade secret information.  Thus, to the extent the information that

was exchanged in the first three of HCS's alleged Trade Secrets determined, for example, what

data fields would be presented to the operator, in what order and in what format; that

information is not trade secret information because it is readily deducible to anyone using the

program or programs.  HCS's narratives with regard to the first three Trade Secrets suggest that

their input was instrumental in identifying functionality that would later be manifested as

computer programs or subroutines within programs.  When that functionality is later apparent to

a person operating the computer program, the information that lead to the incorporation of that

functionality cannot be considered a trade secret.

The court concludes HCS has failed to adequately demonstrate that the information

reflected in the first three of its alleged Trade Secrets are, in fact, trade secrets.

### *2. "Workflow Processes And Flows" Trade Secrets*

The Trade Secrets listed in Appendix 1 at numbers 4 through 11 consist of eight alleged Trade Secrets that have to do with HCS's input into TriZetto's programming efforts having to do principally with how front-end brokers and marketers of health insurance organize and order the steps involved in sighing up customers.   There are two patterns of facts that typify the eight alleged "Workflow Processes and Flows" Trade Secrets.   The alleged Trade Secrets numbered 6, 7, 8 and 9 each allege that some proprietary document, usually a workflow diagram, was given by HCS to TriZetto, usually upon the latter's request for the purpose of facilitating an understanding of workflow process that would enable TriZetto to design and build its components of the interface software.   As discussed above, to the extent HCS transmitted tangible information to TriZetto in the form of workflow process charts, those documents do not constitute trade secret information where the information contained in the charts is later manifested in how the software functions.   See Silvaco, 184 Cal.App.4th at 221-222 (information describing proprietary method of carrying out a programming function found in other similar programs is not a trade secret).

Trade Secrets numbered 4, 5 and 10 appear to allege with similar vagueness simply that HCS was a participant in an exchange of information wherein HCS orally offered its "insight," "proprietary knowledge," or unspecified "Trade Secretes" in order to further TriZetto's understanding of workflow processes and trade procedures.   The following assertion represents an argument or sentiment that seems to typify HCS's contentions as to the status of oral or unwritten information it shared with HCS:

> In providing the response that drove the design of the workflow diagram that was used by [TriZetto] personnel in understanding exchanges, and in participating in several calls and meetings regarding exchanges with [TriZetto] Mr. Everett provided know-how and trade secrets to [TriZetto] helping [TriZetto] understand how it could facilitate a technical integration between Facets® and an exchange via the "To" interfaces."

Appendix 1 at ¶ 4.

The final alleged Trade Secret of this group – Trade Secret numbered 11– appears to be

something of a catch-all allegation:

> HCS provided [TriZetto] with significant process flows during the development of QuoteToCard.  Many of these flows are based on the documents provided by HCS as described elsewhere in this document and conversations and discussions between the parties.  Among other things, the diagrams included in these exhibit [sic] reflect HCS's proprietary know-how concerning what actions would be needed to complete the process flows for QuoteToCard particularly the quoting and enrollment flows for small business plans, including Interface 1 "addProtoGroup."

Appendix 1 at ¶ 11.

HCS's second group of alleged Trade Secrets suffer from the same problem the first group did; there is no specificity in the designation of any of the alleged Trade Secrets, and HCS fails to explain in sufficient detail how the alleged Trade Secret, to the extent it can be discerned, is a trade secret.  Keeping in mind that HCS has the burden to show that what it alleges are Trade Secrets are, in fact, trade secrets; it is HCS's burden to explain that workflow diagrams (for example) that it gave to TriZetto did not merely reflect facts that would be known to any other software company designing front-end software for the small business market or that those work flows would not be manifest in the operation of the finished program.  Just as bare assertion of a legally required element is insufficient for purposes of pleading a claim for relief, so too the bare assertion that a document represents "proprietary insight" or "know how" or is a "trade secret" is insufficient to carry the burden to show that is the case.

HCS's narrative regarding the alleged Trade Secret numbered 11 seems to exemplify to some extent HCS's contentions regarding its role vis-á-vis "Trade Secrets."  It appears that HCS considers that its participation in the joint effort to connect its Quote product with TriZetto's Card product conferred trade secrets upon TriZetto to the extent that HCS had any substantive knowledge that was useful to TriZetto's effort to write it's "To" interfaces.  The general sense one gets from reading the narrative descriptions of the Trade Secrets is that if HCS knew something useful and transferred it by any means to TriZetto, then a "Trade Secret" was the thing transferred.  The point that HCS seems to skip over in asserting that there was a transfer of Trade Secrets is that information is not necessarily a trade secret simply because it is known by

22

one party and not the other.  The two relevant questions are (1) would the information likely be known to someone else that is expert in the claimant's line of work; and (2) does the information have independent economic value because it is not generally known to the public?  As noted above, the plaintiff has the burden to answer both questions when asserting the misappropriation of a trade secret.

To the extent that the parties' pleadings have given the court a basis for understanding what "work processes" and "workflows" are, the court understands that these subjects address and prescribe a particular, and perhaps even proprietary, way of doing something that would (1) be done in a similar if not identical way by someone else in the same field and (2) would be evident to a person using the program for its intended purpose.  Again, the California appellate court's decision in Silvaco makes it clear that descriptions of the design and function features of software are not *information* within the definition of California's UTSA, even where a particular design or functional element may be unique to that software.  See 184 Cal.App.4th at 221 (a proprietary method of carrying out a function also found in competing programs is not trade secret information).  Thus, the court concludes that if, for example, HCS provided TriZetto with a diagram showing HCS's proprietary method of ordering data entry for a particular function, neither the diagram nor a description of how data entry for that particular function was ordered in the finished program would be considered a trade secret.  This is because both the information contained in HCS's diagram and the description of it's functionality in a users manual are evident to any member of the public that uses the program.  See id.

The court concludes that HCS has failed to show that any of the eight Trade Secrets listed in Appendix 1 at paragraphs 4 through 11 are, in fact, trade secrets.

### 3. The "Rating and Underwriting" Trade Secrets

HCS's alleged Trade Secrets numbered 12 to 23 are concerned primarily with information allegedly transmit from HCS to TreZetto concerning various aspects of rates and underwriting.  As an initial matter, HCS uses terms including "rates," "rating process," "rating

workflow" and "rating rules" without explaining precisely what is meant by "rating" or by any of the terms it is used with.  Based on the context presented by the narratives, it may be concluded that "rates" generally refers to the premium rates set by healthcare insurance companies for a given plan.  "Rating rules" apparently refers to the rules that determine what rate will apply in a given set of factual conditions and how that rate might change under changed conditions.  The court infers that "rating process" and "rating workflow" refers to the steps that are taken to determine a rate and the order in which they are taken, respectively.  According to Black"s Law Dictionary an "insurance underwriter" is "an insurance company employee who is responsible for determining whether to issue a policy and the amount to charge for the coverage provided."

TriZetto, contends and provides evidence to support the contention that rates, rating rules and underwriting rules are determined by and made public by the insurance companies. See  examples of rating guidebooks provided by various insurance companies at Exhibits 28, 29, and 30 to TriZetto's Opposition.  Thus, neither rates themselves nor underwriting rules (as published and distributed by the insurance companies) are trade secrets.  A reading of HCS's alleged Trade Secrets numbered 12 to 23 indicates they consist primarily of allegations that HCS contributed information that TriZetto allegedly did not know and that the information was useful to TriZetto in writing the various "To" programs.  In three of the alleged Trade Secrets from this group, it is apparent that HCS contributed some discrete thing (perhaps in addition to oral or informal communications).  In the first two of these HCS alleges it contributed a workflow diagram pertaining to rating, Trade Secrets numbered 13, and in the second HCS alleges it sent TriZetto "a summary file of the underwriting guidelines for California carriers," Trade Secret numbered 14.  The third alleged Trade Secret involving the transfer of a tangible item to TriZetto consists of a "Scoping Document for Impact of Adding Medical Underwriting." It appears from HCS's narrative that the scoping document's purpose was to assist TriZetto in estimating the amount of development work that would be required for the development of

various interface functions.

The remainder of the alleged Trade Secrets under this heading appear to consist of instance where HCS provided oral or e-mail consultation in response to a request for information by TriZetto.  HCS's narrative describing alleged Trade Secret numbered 17 – Medical Underwriting Processes – typifies the allegations in this group that do not appear to involve transfers of physically tangible information:

> Mr. Masciopinto participated in the [telephone call with a representative from TriZetto] and provided know-how and proprietary knowledge about medical underwriting and rating that [TriZetto] needed to know in order to integrate Facets® with a sales automation application pertaining to rating and underwriting functions.  After this call, Ms. Hammond-Watson [of TriZetto], on May 11, 2010, sent an email indicating the certain sections of the development plan document (BRD) had been updated based on the call.  The sections she noted that had been updated contained HCS's trade secrets and know-how regarding medical rating and underwriting, which [Trizetto] incorporated into the functionality and components of Interface 4 "rateLoad."

Appendix 1 at ¶ 17.

This group of alleged Trade Secrets, perhaps more than any of the others, appears to involve information that is very likely to be in the nature of information generally known to other persons skilled in the same field and therefore not trade secrets.  Certainly, there is no doubt that procuring rate quotes is integral to the underwriting process.  It follows that rate acquisition is a functionality that is common to all programs that might compete with HCS's Quote program.  TriZetto's exhibits that contain the underwriting guidelines for various healthcare insurers.  The guidelines are quite thorough and specific.  It follows that, in most cases what HCS has alleged as a Trade Secret regarding underwriting is more along the lines of "this is the way *we* do it" information.  Perhaps the information is specific to HCS is some particular, but, pursuant to the foregoing discussion of the holding in Silvaco there is no real trade secret because any provider of front-end software has the same basic information; they may just handle it differently.  The same can be said for information pertaining to rates themselves, which clearly are the property of insurance companies.  How HCS handles and processes information like rates and underwriting rules that are commonly handled by all front-

25

end software providers cannot be held to have independent economic value on account of its confidential nature because each of the software providers handles the same core information their own way.

While the foregoing observation is not enough to establish that *all* of the alleged Trade Secrets listed under the heading of Rating and Underwriting are not actually trade secrets; it is sufficient to show that it is very plausible that none are trade secrets. HCS has provided no information (other than labels) to establish otherwise. The court concludes that HCS has failed to provide any evidence to satisfy its burden to show that any of the alleged Trade Secrets in the group labeled Rating and Underwriting are, in fact, trade secrets.

### *4. Miscellaneous Trade Secrets*

HCS alleges three Trade Secrets, numbered 24 through 26, under the heading of Miscellaneous. The first of these is labeled "Input on 'Enhancements to v1.0' and 'Renewals' Development Plans." It is frankly difficult to tell what the alleged Trade Secret is from the narrative description. It appears that HCS representatives participated in talks and an "on site walk thru." HCS asserts that, as a results of HCS's participation, revisions were made in what appear to be planning documents. HCS contends that the updated documents "show how HCS personnel attended meetings at the request of [TriZetto] and orally provided information based on their experience and insights into the marketplace that were then incorporated in the development plan documents used by [TriZetto] to integrate Facets® to HCS's sales automation application." Appendix # 1at ¶ 24.

HCS's alleged Trade Secret numbered 24 is not actually a trade secret because no facts are alleged that would make it a trade secret. What HCS has alleged is that its employees participated in meetings and offered opinion and information based on their "experiences and insights." There is no claim, much less any explanation, that these experiences and insights constitute a trade secret.

HCS's last two alleged Trade Secrets involve the transfer of tangible documents between

1    HCS and TriZetto.  The first of these – Trade Secret numbered 25 – alleges a document titled

2    "HealthConnect Quoting Services Application Programming Interface Document" (hereinafter

3    the "Quoting Services Document") was provided to TriZetto by HCS pursuant to a request by

4    the former.  HCS alleges that the document transferred "is a trade secret of HCS and outlines 'a

5    set of services that allow vendors access to HealthConnect's plan and rate information via the

6    web.' [TriZetto] used this document to understand how a sales automation application such as

7    HCS's synchronizes plans and rates with a back-end platform such as Facets®."

8           The Quoting Services Document describes itself as outlining "the necessary

9    requirements for connecting to the Services and describ[ing] in detail the API's[4] for the

10   Services."  An examination of the Quoting Services Document indicates it reveals no source

11   code but does specify software requirements, how it is accessed, and describes the data elements

12   of "Quote Request" and "Quote Response," the two major subroutines in the Service.  While the

13   information in the Quoting Services Document is decidedly technical in nature, the impression

14   is that it describes how the Quoting service behaves from the operators point of view which, as

15   discussed *supra*, is not a trade secret.

16          Further, HCS's narrative itself suggests that the Quoting Services Document was

17   provided to TriZetto not for the purpose of providing specific information to be incorporated

18   into TriZetto's programming, but for background information on how they (HCS) carry out a

19   function that can be assumed to be carried out in similar, though not identical, ways by other

20   companies in the business.  The Quoting Services Document, even if it qualifies as a trade secret

21   itself, does not appear to have been *used* by TriZetto.  At maximum, HCS alleges that the

22   Quoting Services Document helped TriZetto "to understand how a sales automation application

23   such as HCS's" works.  This falls far short of alleging that TriZetto actually used, much less

24   _____

25          [4]   API stands for Application Programming Interface.  Wikipedia defines an API as "a particular set of
     rules ('code') and specifications that software programs can follow to communicate with each other. It serves as an
26   interface between different software programs and facilitates their interaction, similar to the way the user interface
     facilitates interaction between humans and computers."

27

28                                                    27

embodied, the information in the Quoting Services Document into any program or discription.

The last of HCS's alleged Trade Secrets – Trade Secret numbered 26 – is labeled "implementation tools."  Although the transfer of a number of documents are alleged, there is little in the nature of the Trade Secret alleged.  HCS explains the Trade Secret transfer as follows:

> In her email [response to Trizetto's request] Ms. Jones included numerous documents related to HCS's procedures for implementing a new carrier client. This information is necessary to better understand the range of services provided by a sales automation provider and how such a provider works with a carrier to implement those services. [TriZetto] wanted to know this information so it could coordinate how [TriZetto] would complete a coordinated implementation with such a company's front-end sales automation application and [TriZetto's] back-end core administrative platform.  In the diagram in Exhibit E to the Everett Declaration, on the left side, is a list of items needed for "enrollment Mgr: Installation Guide," including an "Implementation Guide," and the insight provided by HCS (as described above) could be used by [TriZetto] in order to provide instruction to a sales automation vendor and health carrier on achieving a coordinated implementation with Enrollment Manager.

Appendix 1 at ¶ 26.

Here again, HCS fails to identify the "Trade Secret" with any specificity.  As the court reads the narrative, there no description of what the information was, or of a direct connection between the information provided and any specific product, including the  "Implementation Guide."  The narrative only alleges that the "insight" provided by HCS *"could* be used by TriZetto in order to provide *instruction* to a sales automation vender [presumably an HCS competitor] on achieving a coordinated implementation with Enrollment Manager."  Reading the narrative as a whole, what emerges is the allegation that HCS helped TriZetto understand the front-end systems requirements so that TriZetto would be able to work more productively with HCS's competitors.

If there is a trade secret here, HCS has failed to describe it with enough clarity to support a claim for trade secret misappropriation.

### 5. *Trade Secrets Alleged in Masciopinto Reply Declaration*

To the extent it alleges additional Trade Secrets, the Masciopinto Reply Declaration

focuses on the contents of the QuoteToCard Services Reference 1.10.  TriZetto refers to this document as "Service Guide for the Q2C Manager" (hereinafter, the "Service Guide").  The Masciopinto Reply Declaration alleges three additional Trade Secrets, again categorized under the heading of Conception and Design, Rating and Workflow.  The first of the three alleged Trade Secrets alleges that the Table of Contents of the Service Guide contains a trade secret that consists of a "[d]escription of [the] conception architecture for creating [an] integrated end-to-end solution."  Masciopinto Reply Dec. at 1:28-2:1.  The second of the alleged Trade Secrets, categorized under the heading of Rating, alleges that the Service Guide contains HCS Trade Secrets contained in the "Description of EnrollQTCFamily interface" which "includes new rate overriding features" and "facilitates loading more complex rate structures into Facets® from the sales front end (e.g. HCS)."  The Masciopinto Reply Declaration also alleges, with regard to the Rating category, that the Service Guide describes the "rateLoad interface and service" which is a new service with QuoteToCard and is related to the "group Rate Load."  The last of the three Trade Secrets set forth in the Masciopinto Reply Declaration is alleged under the heading of Workflow.  HCS alleges that the Service Guide describes the "Trigger QTCAction interface" which "is a new service with QuoteToCard to enforce validation on a group before being submitted to QTC."  Masciopinto Reply Dec. at 2:10-16.  HCS alleges that the need for the TriggerQTCAction was "defined early on by HCS" and that the "need for override capabilities were also indicated early in the QuoteToCard project by HCS."  Id.

The Service Guide is a document prepared by TriZetto that describes software that TriZetto claims it wrote and owns.  Nothing in HCS's Reply brief or in the Masciopinto Reply Declaration contradicts TriZetto's claim of authorship and ownership of the software described in the Service Guide.  Consequently, the HCS cannot claim that the Service Guide itself is HCS's trade secret, but HCS must point with the previously discussed specificity at the trade secrets are HCS claims belong to it.  As above, HCS's contention that the Service Guide is, or contains, Trade Secrets fails first for lack of specificity and fails in addition because the

29

information that is actually disclosed by the Service Guide does not qualify as trade secret information. The court has reviewed the Service Guide and concludes that the portions of the Reference that HCS references (other than the table of contents) consists of tables which describe for each subroutine each data element, the type or format of each element, whether the element is optional or required, and a short description of the data element. The information referenced by HCS (including the table of contents) is information that would be evident to anyone interacting with the QuoteToCard system. As such, the information transmitted by the Reference is not trade secret information as discussed above.

The court concludes HCS has failed to allege the existence of information it owns that would qualify as trade secret information.

### C. Misappropriation

Although no instance has been identified where HCS *might* have adequately described a Trade Secret, it is assumed for purposes of the following analysis that one or more Trade Secrets have been identified. The next question is whether any can be said to have been misappropriated. California's version of the UTSA describes misappropriation in terms that encompass both direct and indirect misappropriation. Because the relationship between HCS and TriZetto is direct, the following portions of California Civil Code section 3426.1 that include the definitions of direct misappropriation are relevant to this inquiry:

(2) Disclosure or use of a trade secret of another without express or implied consent by a person by a person who:

(A) Used improper means to acquire knowledge of the trade secret; or

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

Id. Misappropriation "is defined by the Uniform Act as [improper] acquisition of a trade secret *or* disclosure of a trade secret *or* use of a trade secret. ([Cal. Civ. Code] § 3426.1, subd. (b)(1) & (2).)" Glue-Fold, Inc. v. Slautterback Corp., 82 Cal.App.4th 1018, 1025 (1 Dist. 2000) (italics in

original).  "Improper means" of acquisition is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.  Reverse engineering or independent derivation alone shall not be considered improper means."

From the foregoing, it is evident that three possible constructions of allegation  of misappropriation are possible within the context of the facts of this case.  Either:

(1)  HCS can allege that TriZetto *obtained* trade secrets by improper means; or

(2) HCS can allege that TriZetto obtained the secrets lawfully but *disclosed* the trade secrets under conditions that gave rise to a duty to maintain secrecy; or

(3) HCS can allege that TriZetto obtained the secrets lawfully but *used* the trade secrets under conditions giving rise to a duty to limit their use.

### 1.  Misappropriation by Improper Means

While HCS's motion for preliminary injunctive relief does not explicitly state their theory of misappropriation, it appears clear that there is no allegation that TriZetto obtained the Trade Secrets by improper means.  The parties acknowledge that the Agreement authorized the parties to disclose to each other and to receive from each other trade secret information for the purpose of developing the interface capability.  HCS does not allege that TriZetto entered into the Agreement with the intent to later abrogate the exclusivity provisions.  Consequently there is no allegation of promissory fraud or any other claim that would void the Agreement *ab initio*. Although HCS alleges that TriZetto formed the intent to terminate the Agreement a week or two before it did, there is no allegation that TriZetto actually violated any term of the Agreement prior to its termination by TriZetto.

Since all of the information that was acquired by TriZetto was acquired according to the terms of the Agreement, there is no doubt that TriZetto did not misappropriate HCS's Trade Secrets by improper means.

### 2.  Misappropriation by Unlawful Disclosure

As previously noted, the Agreement does not define "Trade Secret" at all.  Although the

31

Agreement defines "Confidential Information," it does not do so in a way that enlarges the

category of trade secret beyond its statutory or common law boundaries.[5]   Nor is there any

provision apparent to the court that defines disclosure.  Thus, the relevant questions are what

qualifies as disclosure under common law and did TriZetto use such a means to transmit trade

secret information to another?

HCS's motion for preliminary injunction explicitly contends that injunctive relief is

available to prevent threatened disclosure of trade secrets.  See Motion at 16:24-17:7 (citing

Wyndham Resort Dev. Corp. v. Bingham, 2010 WL 2720920 (E.D. Cal. 2010) at *6; Cal. Civ.

Code § 3426.2(a); and Central Valley General Hosp. v. Smith, 162 Cal.App.4th 501, 527

(2008).  HCS contends it is facing the threat of disclosure of the Integrated Solution product that

is described as the "QTC Manager."  HCS alleges its trade secrets, including two or three of the

"To" interfaces are "embodied in" the QTC Manager which TriZetto is alleged to have renamed

"Enrollment Manager" in preparation for marketing to HCS's competitors.  HCS's contends its

Trade Secrets will be disclosed in the process of the marketing of Enrollment Manager to HCS's

competitors.  In its reply brief HCS shifts its emphasis to a document that HCS alleges TriZetto

has, or is prepared to, distribute to HCS's competitor, Connecture.  HCS describes the document

as "a 343-page technical blueprint of the HCS-[TriZetto] project containing HCS's trade secrets

on every aspect of the project."  Reply at 1:7-8.

HCS's allegation that TriZetto threatens disclosure of HCS Trade Secrets and the

allegation that TriZetto has or will disclose HCS Trade Secrets by disclosing the contents of the

Service Manual are different in that the second allegation postulates a specific means of

disclosure and the first does not.  HCS's generalized assertion that TriZetto's efforts to market

Enrollment Manager will result in the disclosure of HCS's trade secrets leaves it to the court to

---

[5]   In Ajaxo, Inc. v. E*Trade Group, Inc., 135 Cal.App.4th 21 (6th Dist. 2006), the court noted that a non-disclosure agreement or its equivalent could contractually expand liability by way of breach of contract claim to situations where the non-disclosure agreement includes information that would not qualify as trade secret under the UTSA.  Id. at 62 n.38.  In Ajaxo, the non-disclosure agreement specified that "know-how" and other forms of information were "confidential information" covered under the agreement.  Id. at 27-28.  Such is not the case here.

infer how such disclosure would occur.  While injunctive relief is available for threatened

disclosure of trade secrets, a court cannot presume that such disclosure is inevitable based only

on the fact of a business association between the defendant and the plaintiff's rivals.  See

Whyte, 101 Cal.App.4th at 1458 (inevitable disclosure doctrine is not the law in California).

Where the disclosure consists of a computer program, the only inference that can be drawn is

that there will be a transfer of information about the program's functionality, not about the

source code or any trade secrets embodied in the source code.  See Silvaco, 184 Cal.App.4th at

228-229 (6 Dist 2010) (using a computer program provides no information as to how it was

programed, only what it does).

Because the court cannot presume the transfer of trade secret information occurs simply

because TriZetto possesses it and TriZetto's actual or potential customers do not, and because

the transfer of or access to compiled software alone does not imply the transfer of trade secrets,

HCS must satisfy its burden by stating with some specificity how the disclosure of trade secrets

is threatened.  HCS cannot meet this burden merely by making blanket assertions that

Enrollment Manager or some other TriZetto product embodies HCS Trade Secrets and

TriZetto's efforts to market these products to others threatens disclosure.

With regard to the actual or threatened disclosure of Service Guide, the dispute between

the parties is more direct.  HCS contends that the Service Guide contains HCS Trade Secrets

"on every aspect of the project" and TriZetto contends the Service Guide contains no HCS trade

secrets at all.  There is no question that the contents of the Service Manual was and/or will be

disclosed to whomever TriZetto has or will market its enrollment manager product to.  The

question is therefore whether the Service Manual contains any trade secrets.  The court has

already answered this questions in the negative.  The Service Manual is, so far as the court can

tell, contains a description of what someone operating the program would experience and is

therefore not a trade secret.  Of the three possible means of misappropriation, unlawful

disclosure most strongly suggests injunction as the most appropriate form of relief because the

potential harm is both difficult to contain and difficult to compensate by damages.  However, to the extent the court can discern the identity of the alleged Trade Secret from HCS's pleadings and oral argument, all the court can conclude is that HCS's is threatened by the disclosure of a computer program written by TriZetto that is identical to the program HCS developed with TriZetto.  As the court has repeatedly pointed out, while computer source code is a trade secret, the way it operates is not.  Presumably HCS will market QuoteToCard to its customers, revealing in the process how the program works, looks, performs and the purpose behind it.  TriZetto will presumably do the same.  No trade secrets will be divulged in the process because the way the programs work is public.  If HCS is to prevail on their claim of misappropriation by unlawful disclosure, HCS will need to be far more specific with regard to the nature of its trade secret, how HCS comes to own the trade secret and how disclosure it threatened.

### 3.  Misappropriation by Use

As stated in <u>PMC, Inc. v. Kadisha</u>, 78 Cal.App.4th 1368, 1383 (2000), "Employing the confidential information in manufacturing, production, research or development, marketing goods that embody the trade secret, or soliciting customers through the use of trade secret information, all constitute use."  <u>Id.</u> (quoting <u>Kappa v. CrossTest, Inc.</u>, 2008 WL 821637 (Cal.App. 1 Dist. 2008) at *12).  In <u>JustMed, Inc. v. Byce</u>, 600 F.3d 1118 (9 Cir. 2010), the Ninth Circuit noted with approval the definition of use provided in the Restatement (Third) of Unfair Competition:

> There are no technical limitations on the nature of the conduct that constitutes "use" of a trade secret for purposes of the rules stated in Subsection (b) [of Idaho's version of the UTSA].  As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" under this Section.  Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development or soliciting customers through the use of information that is a trade secret all constitute "use."

Restatement (Third of Unfair Competition § 40, cmt. c (1995) (citation omitted).  The term "use" in the in the context of misappropriation of a trade

secret generally contemplates some type of use that reduces the value of the trade secret to the trade secret owner.

JustMed, 600 F.3d at 1130.

The importance of the "use" theory of misappropriation in this action is that it appears to be the only theory under which HCS could state a claim if they were able to identify any trade secret that they possessed that was transferred to TriZetto. The Silvaco court observed, "[t]rade secret law, in short, protects only *the right to control the dissemination of information*. 184 Cal.App.4th at 221 (italics in original). HCS tacitly admits that it does not "own" any of the software written by TriZetto. Absent formal "ownership" of TriZetto's side of the QuoteToCard/Enrollment Manager software, how does HCS purport to control the dissemination of information that TriZetto claims (without opposition) it "owns?" The phrases HCS has used repeatedly to describe its relationship to TriZetto's software is that HCS's Trade Secrets, know-how, trade experience, insights, and business acumen were "incorporated into," "embodied in," or determined some aspect of, the software that was written by TriZetto. Thus, the connection point between the legal theory of misappropriation of trade secrets by use and HCS's motion for preliminary injunction is the allegation that TriZetto is about to engage in the "marketing of goods that *embody*" HCS's Trade Secrets.

Just as the word "use" does not appear to be bound by a specific technical definition, so too the word "embody" does not appear to have a particular technical definition in the context of trade secrets. Given that what is at stake is the right of economic control over a valuable product that formally belongs to TriZetto, the court feels it should be circumspect with regard to the scope of meaning it imparts to the word "embody." If a Westlaw search is conducted to find cases within the Ninth Circuit that use the word "embody (or related words) within the same sentence as "trade secret," about seventy-seven cases are returned. Although the court admits it has not reviewed each of those, the court cannot find a single case where the term "embodied" is taken in an abstract sense to mean something like influenced, directed, or reflected in.

1    What the court concludes from its review of the relevant case authority is that the word

2    "embodied" does not modify the meaning of "use," but rather illustrates one possibility of "use."

3    "One clearly engages in the 'use' of a secret, in the ordinary sense, when one *directly* exploits it

4    for his own advantage, e.g., by incorporating it into his own manufacturing technique or

5    product." Silvaco, 184 Cal.App.4th at 224 (italics added).  The Silvaco court's use of the word

6    "directly" leads this court to the conclusion the word "embody" is to be taken in its more literal

7    sense to mean to "place bodily into."  Thus, a trade secret embodied in the product of a

8    misappropriating party is "used" if it is incorporated *as such* in the resulting product.

9    HCS relies heavily on Ajaxo, Inc. v. E*Trade, Inc., 135 Cal.App.4th 21 (6th Dist. 2006)

10   to support its contentions that the items HCS lists as Trade Secrets are actually trade secrets.

11   Ajaxo is distinguishable from the instant case in a number of important respects,[6] but the case

12   does help clarify what is meant by the "use" of a trade secret through its "embodiment" in the

13   misappropriator's product.  In Ajaxo, the plaintiff had developed and written software to enable

14   users of wireless mobile devices to engage in stock trading.  Id. at 27.  In the process of

15   marketing the software product to the defendants, the plaintiff, pursuant to a mutual non-

16   disclosure agreement, disclosed to the defendant a number of discrete, highly specific facts

17   about plaintiff's software and provided to the defendant a technical binder that contained

18   additional specific technical information concerning the plaintiff's software product.  See Id. at

19   227-229 (plaintiff provided answers to technical software questions such as "buffering the

20   cookie," "sustaining the session," "destruction of the session," "load balancing" and "other

21   matters").

22

23   _____

24   [6]    The decision in Ajaxo is in the context of several post-trial motions by both the plaintiff and defendants
     challenging various aspects of the trial and the jury's verdicts.  As previously noted, the scope of protectable "trade
     secrets" was significantly expanded in Ajaxo because the non-disclosure agreement expressly included within the
25   ambit of protectable trade secrets certain types of programming know-how that would not necessarily otherwise
     qualify as trade secret information.  In addition, the jury in Ajaxo determined that the defendant E*Trade had
26   willfully and maliciously misappropriated Ajaxo's trade secret(s) and had disclosed them to another defendant for
     the express purpose of enabling the other defendant (Everypath) to construct a product that duplicated Ajaxo's
27   performance capability.  See 135 Cal.App.4th at 26 (summarizing jury verdict).

28                                                      36

In <u>Ajaxo</u>, unlike the instant factual context, the defendant took highly specific technical information concerning a computer program that was created and owned by the plaintiff and directly used that information (through disclosure to a third party) to essentially copy the program capability that belonged to the plaintiff in that case.  Here, there is little doubt that TriZetto made use of HCS's knowledge of how the front end of healthcare insurance works generally and, to some extent, how HCS's data inputs and outputs work.  However, HCS has failed to show how definite pieces of its knowledge, pieces that themselves qualify as trade secrets, recognizably show up in, or are "embodied in" TriZetto's programming.  At its core, HCS's argument is a contention that, because HCS provided generalized information that shaped or influenced some portions of the architecture of TriZetto's product, Enrollment Manager, HCS has the right under California's UTSA to control what TriZetto does with its product.  The court cannot find, and HCS has not provided, any case or statutory authority that would allow this court to impose so sweeping a restriction based on such an attenuated relationship between HCS's knowledge and TriZetto's product.

The court concludes that HCS has failed to allege facts sufficient to show that it has a high likelihood of success on the merits of its claims against TriZetto on its claims under the California UTSA.

**II.  Threat of Irreparable Injury**

HCS asserts two bases for a finding of irreparable harm.  The first is a provision in the Agreement whereby the parties agree to injunctive relief in the event there is a transgression of the restrictive covenants by the other party regarding the handling of confidential information.  As provided in subsection 11.3 of the agreement, the parties agree that remedies available to the party that suffers the transgression "are inadequate at law."  Of some significance, the section of the Agreement that stipulates that remedies are inadequate at law – section 11 – deals with the duties of each party to not *disclose* the confidential information of the other.  So far as the court can discern, section 11 of the Agreement does not deal with the unauthorized *use* of confidential

1   use of information.  Thus, to the extent HCS seeks to impose injunctive restrictions on

2   TriZetto's efforts to market its Enrollment Manager software based on the remedies provision of

3   the Agreement, that effort is undercut to the extent HCS is unable to allege that TriZetto's

4   activities *disclosed*, as opposed to *used*, any of HCS's Trade Secrets.  In any event, the court is

5   in agreement with TriZetto's contention that private contractual provisions do not determine the

6   legal conclusions.  TriZetto cites DVD Copy Control Ass'n v. Kaleidescape, 176 Cal.App.4th

7   697, 725 (2009) for the proposition that the court is not bound by a private agreement and

8   should not use the private agreements of parties to determine a legal conclusion.  The court will

9   continue with its own determination of the issue of whether HCS suffers the threat of irreparable

10  harm as a consequence of TriZetto's actions.

11          In its reply brief, HCS contends that it will suffer irreparable harm in the absence of

12  injunctive relief because: (1) TriZetto will disclose HCS's trade secrets to HCS's competitors,

13  (2) HCS will lose competitive advantage and (3) HCS will suffer loss of market status and loss

14  of customer good will.

15          As discussed above, unless HCS can point to an actual trade secret in the service manual

16  or in some other document that will be provided directly to a competitor, there is no basis upon

17  which the court could find irreparable harm resulting from disclosure.  Pursuant to Silvaco,

18  when the Source code for the Enrollment Manager or QTC manager program is compiled and

19  operational, any feature of its functionality is not a trade secret because it is publically expressed

20  in program operation.  There is no plausible argument that TriZetto would have cause to

21  disclose its source code to any other party in order to market its Enrollment Manager software.

22  HCS has not indicated any other means by which disclosure could occur except through the

23  Service Manual or through marketing of the Enrollment Manager.

24          With regard to competitive advantage and loss of market status and goodwill, there is no

25  dispute that such harms, where they occur or threaten to occur, do warrant injunctive relief

26  because such harms are inestimable.  However, under the facts of this case, there is little to

27

28                                               38

suggest that such losses would be the result of misappropriation of trade secrets as much as the loss of exclusivity under the Agreement.  HCS's only expectation of competitive advantage in the marketplace arises from the exclusive marketing provision contained in the Agreement. Loss of exclusivity is therefore a matter of breach of agreement, not trade secret misappropriation.  Thus, it appears that HCS's loss could well be inadequately compensable at law but injunctive remedy would nonetheless be unavailable in this court because the harm arises from breach of contract, not trade secret misappropriation.  In addition, HCS, if it were able to enforce the exclusivity provisions of the Agreement for the full initial term of the Agreement, would only be entitled to prohibit TriZetto from marketing Enrollment Manager to HCS's competitors for about three years.  HCS does not allege that the universe of companies that provide front end computer software in the same marketplace as HCS is vast.  Over a limited period of time, the court cannot conclude that HCS, should it ultimately be successful in proving trade secret misappropriation, would not be able to accurately assess the loss of its anticipated share of market revenue from the misappropriation.

HCS also asserts that loss of customer goodwill would result from TriZetto's misdeeds, but fails to explain how that is so.  HCS achieved the interface capability it sought and may presumably offer the QuoteToCard functionality to its customers.  At worst, HCS will be able to offer a product the same or similar in function to the products that could be marketed by competing companies that by TriZetto's Enrollment Manager.  The court is at a loss to understand how being on an *equal* (although not exclusive) marketing footing would result in a loss of the goodwill of existing or potential customers.

The court concludes that HCS has failed to show a reasonable probability of success on the merits of its action for trade secret misappropriation and has failed to adequately show that it faces the threat of irreparable harm as a result of TriZeto's actions.  The court therefore finds preliminary injunctive relief is not warranted.

THEREFORE, it is hereby ORDERED that HCS's Motion for Preliminary Injunction is DENIED.

IT IS SO ORDERED.

Dated: _____September 12, 2011_____

_____
CHIEF UNITED STATES DISTRICT JUDGE

40